**ITEL CORPORATION and United States Trust Company of New York, ITEL Corporation, Agent, Appellants,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 81–672.

District of Columbia Court of Appeals.

Argued Feb. 24, 1982.

Decided July 21, 1982.

Before NEWMAN, Chief Judge, and KERN and BELSON, Associate Judges.

NEWMAN, Chief Judge:

The sole issue in this case is whether the District of Columbia personal property tax is applicable to privately-owned personalty located on federally-owned land in the District. Appellant ITEL Corporation contends that federally-owned areas within the District are "federal enclaves" and that the personalty tax must be read as not reaching private property located within them. But regardless of how such areas are characterized, all parties must concede that Congress has the power to authorize the application of a tax therein. We conclude that it has done so in D.C.Code 1981, § 47–1507, and therefore affirm the Tax Division's order denying a refund.

The relevant facts are simple and undisputed. ITEL Corporation is in the business of leasing data processing equipment.[1] Many of its machines are leased by the United States government and located in various federal buildings within the District. In fiscal years 1978, 1979, and 1980, ITEL paid a total of just over half a million dollars in taxes, penalties, and interest on such property.[2] Refund claims covering those assessments were denied by the District of Columbia Department of Finance and Revenue by letter of November 27, 1979. ITEL subsequently filed a petition for refund in the Tax Division of the Superior Court. Inasmuch as there were no disputed material facts, the case was submitted on cross motions for summary judgment. On April 27, 1981, the trial court

Robert H. Koehler, Washington, D. C., with whom Richard M. Stolbach, Washington, D. C., was on the brief, for appellants.

Richard L. Aguglia, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel and James E. Lemert, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellee.

1. Due to certain financing arrangements entered into by ITEL, title to some of the relevant equipment was held by appellant United States Trust Company of New York during fiscal years 1978 and 1979. However, ITEL now holds the rights to all tax refunds sought in the present case. Hereafter, all references to ITEL's property or claims include those which were formerly held by United States Trust.

2. The exact figure is $500,261.27. Of this total, $446,294.87 represents taxes, penalties, and interest associated with property located within the National Capital Service Area. See D.C. Code 1981, § 9–142(e). The remainder derives from property within the District, but outside the National Capital Service Area. Although appellant believes that the statute creating the National Capital Service Area is relevant to the proper construction of the tax at issue here, it does not contend that the assessibility of particular property depends on whether it is within the Service Area. Since our analysis and conclusions also apply equally to both groups of property, our discussion addresses the entire refund claim as a single unit.

entered an order denying summary judgment for appellant and granting summary judgment for the District of Columbia. ITEL now appeals the denial of its refund claim.

■ Congress has imposed a tax on privately-owned personal property in the District of Columbia for over a century. The current version of that tax is codified at D.C.Code 1981, § 47–1507. It provides in pertinent part: "On all tangible personal property, . . . (over and above the exemptions provided in § 47–1508) . . . there shall be paid . . . the rate of tax provided by law." None of the exemptions listed in § 47–1508 refers in any way to personalty located in federal buildings. On its face, the statutory language encompasses the property that ITEL contends is exempt.

Nor does the legislative history of either section indicate an intended exemption for such property. On the contrary, this history, although sparse, suggests that the tax was meant to reach all private business assets within the District.

> It is inconceivable that Congress will permit personal property in the District of Columbia to remain untaxed. That capital employed remuneratively under the special protection of incorporation laws shall pay nothing for the support of the government has never been the practice in any State or Territory of the Union; and Congress has never contemplated such exemption in the District of Columbia. All property, both real and personal, should pay its just share for the support of the government. [S.REP.No. 1035, 57th Cong., 1st Sess. 4 (1902).]

Thus, on the basis of both the statutory language and its history, one would have to conclude that ITEL's property is not exempt.

■ To avoid this result, ITEL argues for an implied exemption for property located on federal land. This exemption is said to be necessary to protect the national sovereign from "unwanted intrusions" by "lesser governmental entities" in areas of primary federal interest. This premise draws its support largely from cases of questionable relevance to the District of Columbia, as will be discussed below. But even if one accepts the premise, the argument suffers a fatal flaw. The tax at issue here was enacted not by an independent sovereign, or even a partially-independent governmental unit such as the District of Columbia government,[3] but by the Congress itself. It can hardly be said that this amounts to an intrusion on federal prerogatives.

■ Precedential support for this conclusion is found in *Mercury Press v. District of Columbia*, 84 U.S.App.D.C. 203, 173 F.2d 636 (1948), *cert. denied*, 337 U.S. 931, 69 S.Ct. 1495, 93 L.Ed. 1738 (1949). That case upheld the application of the D. C. personalty tax to imported goods, still in the original package, located in a local warehouse pending transport to destinations outside the District. Whereas a state might not be able to tax such imports, D. C. could, since it draws on Congress's constitutional authority to tax imports and exports. The court recognized that there are not two Congresses, one acting as the national legislature and another serving as the District legislature. An act of Congress, although local in scope, is nevertheless not analogous to a state law enacted by an independent legislature.

Since Congress unquestionably has the power to do what § 47–1507 and its legislative history apparently mandate, ITEL must find a means of avoiding straight-forward statutory construction. It argues for a presumption that D. C. tax statutes are not applicable to private property located on federal land. Under this proposed rule of construction, a tax statute does not encompass such property unless it explicitly so states. Broad language like that contained in § 47–1507 would thus be read so as not to reach appellant's computers.

ITEL's argument for this presumption begins with Art. I, § 8, cl. 17 of the U. S.

---

3. Under the Home Rule Act, Congress is authorized to disapprove acts of the District of Columbia Council within thirty days of their enactment. D.C.Code 1981, § 1–233(c).

Constitution. It provides that Congress shall have the power

> [t]o exercise exclusive Legislation in all Cases whatsoever, over such District ... as may ... become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings....

This clause provides the constitutional underpinning for the establishment of certain "federal enclaves" within which congressional authority to legislate, including the authority to tax property, is exclusive.

■ But the language of this clause makes it readily apparent that ITEL's reliance on it is misplaced. The District of Columbia is treated differently from federal enclaves within state boundaries, such as various military bases. Within state boundaries, federal enclaves are areas *owned* by the federal government and purchased with the *consent* of the state legislature. States may withhold consent and thereby retain jurisdiction.[4] In contrast, *all* parts of the District of Columbia are within exclusive congressional jurisdiction,[5] regardless of whether they are privately- or federally-owned. If a presumption or implied exemption is to be derived from Article I, it would have to apply to the entire District. If such a presumption existed, Congress overcame it by enacting § 47–1507, which would otherwise be completely without effect.

ITEL nevertheless attempts to have § 47–1507 treated as if the District were a state and the statute had been enacted by a state legislature. Primary reliance is placed on two cases regarding state taxes in federal enclaves, *Surplus Trading Co. v. Cooke*, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930), and *Humble Pipe Line Co. v.*

*Waggoner*, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964). *Surplus Trading* involved a state personal property tax assessed on surplus blankets bought by a private dealer, but not yet removed from a military base on the assessment day. The Supreme Court held that the general tax statute could not be applied to that property, regardless of statutory intent, since the base was within the exclusive federal jurisdiction under Article I. The base came within exclusive federal jurisdiction only because the state legislature had so consented, not merely because it was federally-owned. The case thus does *not* stand for the proposition that federal ownership ipso facto entails exclusive jurisdiction, but the reverse, that federally-owned land is normally subject to local jurisdiction. The Court's analysis employs no presumption, explicit or implicit, of any kind; state consent is either present or it is not.

*Humble Pipe Line Co. v. Waggoner, supra*, stands for the same general proposition, with the result that a state ad valorem tax could not be applied to private property on an air force base, where the state legislature had ceded exclusive jurisdiction to the federal government. The Court noted that even where federal jurisdiction is exclusive, Congress may consent to the assessment of state taxes. Since § 47–1507 was enacted by Congress, it would constitute congressional consent if any were required. In the words of the D. C. Circuit, "[i]f the consent restriction applies to the statute here involved [§ 47–1507], it has been met, as consent could be evidenced in no clearer fashion than by the fact of enactment itself." *Mercury Press v. District of Columbia, supra* 84 U.S.App.D.C. at 204, 173 F.2d at 637. Thus even if the analysis used in state cases were applicable here, the result would still be that the tax could be applied to personal property on federal land.[6]

---

4. *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964), *Surplus Trading Co. v. Cooke*, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930).

5. Of course the Congress can delegate authority to legislate for the District of Columbia, as it

has done in the Home Rule Act. D.C.Code 1981, § 1–227(a).

6. It is worth noting that personalty taxes applied to equipment leased by non-taxable entities and located on their land have been upheld under state constitutional provisions. In

ITEL also cites *United States v. District of Columbia*, 669 F.2d 738 (D.C.Cir.1981), in support of its conclusion that D. C. property taxes should be treated in a way similar to state taxes. The U. S. government hired a private contractor to organize a conference in a D. C. hotel on a cost-plus basis. Part of the cost passed on was the D. C. sales tax on the various hotel charges. The court first concluded that under the "legal incidence" rule,[7] a state could have collected the tax even though the U. S. government ultimately bears the cost. It further decided that Congress, in enacting the D. C. tax code, did not intend to subject the U. S. to any greater or lesser scope of potential tax liability than it faces outside the District.

But treating the District as if it were a state would not aid appellant. As discussed above, states may normally impose taxes on privately-owned personal property on federally-owned land, and even where there is exclusive jurisdiction, congressional consent waives it. *United States v. District of Columbia* also fails to advance appellant's cause because it deals with the degree to which the federal government is made to bear the burden of District taxes. In contrast, ITEL's theory rests on the *location* of the taxed property or activity, a circumstance that is unrelated to the rationale applied in *United States v. District of Columbia*.

Indeed, to the extent that the case is helpful at all, it militates in favor of denying a refund to ITEL. It shows that the federal government's protection from D. C. taxes is not territorial, but based on the incidence of the tax. Moreover, the intrusion on federal interests is much more substantial where, as in *United States v. District of Columbia*, the government bears the entire financial burden of the tax, than where the only connection is that the assessed property happens to be located on federal land.[8] Finally, the case illustrates that no special statutory authorization is required for the general District sales tax to be applied in a specific instance where federal interests are arguably impinged upon. This is consistent with our conclusion that no explicit additional authorization is required in order for the personal property tax to be applied to private assets on federal land.

Shortly after this case was argued, the Supreme Court handed down its decision in *United States v. New Mexico*, —— U.S. ——, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982). For present purposes, the case is more significant for what it does *not* address than for what it does. It involves a constitutional challenge to the application of two New Mexico taxes to government contractors operating on federally-owned property. One is levied on the gross receipts of all those doing business within the state. The other is a compensating use tax imposed on property acquired out of state in a transaction that would have been subject to the gross receipts tax if it had occurred in New Mexico. The state sought to apply these taxes to federal contractors that manage, or perform construction work at federal research laboratories. According to ITEL's termi-

---

*Kunes v. Samaritan Health Service*, 121 Ariz. 413, 590 P.2d 1359 (1979) (en banc), for example, Arizona's ad valorem property tax was upheld as applied to equipment leased to tax-exempt nonprofit hospitals. Inasmuch as the taxed equipment was the property of private profitmaking businesses, and not the tax-exempt hospitals, it could not fall within the tax immunity that the state constitution authorized the legislature to extend. The result thus turned on ownership of the property, not whether it was used by a tax-exempt institution or located on its tax-exempt land. *See also University of Utah v. Salt Lake County*, 547 P.2d 207 (Utah 1976).

7. The legal incidence of a tax falls on the party who is liable for it, against whom the collecting authority could obtain a judgment for nonpayment, regardless of the fact that the cost may ultimately be borne by some third party. In the case of a sales tax like that involved in *United States v. District of Columbia*, the legal incidence is on the buyer. In the case of a property tax, it is on the owner.

8. It is probably the case that some of the cost of the property tax is ultimately borne by the government through its lease payments. But this is not a relevant factor in the analysis, since ITEL's theory would apply equally to personal property located on federal land, but not leased to the government.

nology, these federally-owned properties, on which government projects are carried out, would have to be deemed "federal enclaves." However, the court held that the imposition of taxes on the activities of these private entities on federal land, and on the property they used in connection therewith, did not offend the Constitution.

Apparently the petitioners in that case recognized, as they should, that the state taxes are operative in federally-owned areas, absent consent to exclusive federal jurisdiction. The tax statutes do not explicitly recite that they are to be applied on federally-owned lands. *See* N.M.Stat.Ann. §§ 72–16A–4, 72–16A–7 (Supp.1975).[9] Yet it is apparent that neither the parties nor the Court thought it possible that this would bar the operation of the tax. Instead, the judicial analysis proceeded by identifying the incidence of the tax, then inquiring whether any of the taxable entities was an "agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities...." —— U.S. at ——, 102 S.Ct. at 1382. Finding that none of the petitioning companies fit this description, the Court concluded that the taxes could validly be imposed on them. The case thus underscores the unhelpfulness of the state tax cases in establishing by analogy a presumption against the application of District of Columbia taxes to private parties on federal land. Indeed, a presumption against District taxes, especially those enacted by Congress, would be a constitutional anomaly since the intrusion on federal interests is much greater under the facts of *United States v. New Mexico.* In that case, the tax was imposed by an independent state legislature—a separate sovereign—and the taxes were passed on directly to the federal government.

Having found no persuasive basis for deviating from § 47–1507's plain meaning,[10]

**9.** In conformity with the Supreme Court opinion, we cite the codification referred to by the parties rather than that now in force. *See* N.M.Stat.Ann. §§ 7–9–1 *et seq.*

**10.** Appellant also raises some subsidiary issues which can be disposed of briefly. It notes that there is no explicit exemption of federally-owned personal property in either § 47–1507 or § 47–1508, although all parties agree that such property is not subject to the tax. It contends that if ITEL is denied a refund on the ground that there is no explicit applicable exemption, federal property must also be taxed. This is a complete non sequitur. By no stretch of the imagination does the possibility that the exemption for U. S. property may be implicit require that there also be an implied exemption for appellant's property. As we have shown above, there is no persuasive basis for establishing an implicit exemption or presumption in favor of private personalty on federal land.

ITEL contends that Congress's usual practice has been to make a specific provision for every instance in which the power of the District government is intended to reach into federally-owned areas within the District. However, Congress's "usual practice" is neither so extensive nor so consistent as to justify a presumption in appellant's favor.

Appellant cites D.C.Code 1981, § 4–116, which provides:

The provisions of the several laws and regulations within the District of Columbia for the protection of public or private property and the preservation of peace and order are extended to all public buildings and public grounds belonging to the United States within the District of Columbia.

However, our decision that the D. C. criminal code applies to acts committed on federal land did not turn upon the existence of an explicit provision, although § 4–116 was cited in a footnote. *McEachin v. United States*, D.C.App., 432 A.2d 1212, 1216 n.7 (1981).

ITEL also invokes the Buck Act, 4 U.S.C. §§ 104–110 (1976), which is an explicit authorization of state sales and income taxes on activities in federal areas. But the legislative history of the Act indicates that, far from supporting a presumption against application of D. C. taxes on federal lands, the drafters assumed the converse.

Subsection (d) defines the term 'State' to include any Territory or possession of the United States. The District of Columbia was not included in the definition since Congress is the local legislature for the District and any sales, use, or income taxes enacted for the District are applicable in all areas within said District. [S.Rep.No.1625, 76th Cong., 3d Sess. 5 (1940).]

D.C.Code 1981, § 1–233(a) is also said to support a presumption of noninterference in areas of predominant federal interest. It provides in pertinent part:

The Council shall have no authority ... to:

(1) Impose tax on property of the United States or any of the several states;

. . . . .

(3) Enact any act, or enact an act to amend or repeal any Act of Congress, which con-

we conclude that the District of Columbia personal property tax is applicable to private personalty located on federally-owned land.

*Affirmed.*

cerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District; .... But the absence of any exemption for personal property on federal land argues more persuasively for the contrary result.

Appellant also relies on the part of the Home Rule Act establishing the National Capital Service Area, in which most but not all of ITEL's property is located. D.C.Code 1981, § 9–142. *See* note 2, *supra.* ITEL interprets the statute as extending limited District authority (not including tax authority) into certain federally-owned areas, where it would not reach without such explicit authorization. In fact, this part of the Home Rule Act serves to add some federal bureaucracy to the existing D. C. bureaucracy in order to *ensure* adequate services, not to

*authorize* the provision of services by the District. The statute explicitly recognizes that D. C. laws and regulations were *already* in effect within the newly created Service Area, and would continue in effect after passage of the Act. D.C.Code 1981, § 9–142(h).

In sum, none of the congressional enactments to which we have been referred provides a persuasive basis for erecting a presumption against the application of a D. C. tax statute in federal areas. Rather, the intent behind each statute must govern. Absent a contrary indication in the legislative history, a general statute is to be applied to private parties throughout the District, regardless of whether the locale of the relevant conduct or personal property is federal or private land.