JiPITCHER, Judge.
This case is before us on partial remand from the Louisiana Supreme Court. For the reasons stated below, we now reverse the trial court’s finding that plaintiffs[2] owed severance taxes for the period of December of 1979 through September of 1982.

FACTS AND PROCEDURAL HISTORY

In our previous opinion, we adopted the facts of these two consolidated cases as set forth by the trial court in its reasons for judgment. For purposes of clarity, we will reiterate the facts:
The State of Louisiana, the City of Shreveport, and the Bossier Levee District conveyed 22,000 acres located in Bossier Parish to the United States in 1930 for the construction of Barksdale Air Force Base. The Bureau of Land Management leased the mineral rights in the portion of the base known as the “Parcel 3 Lands” to Union Producing Company in 1961. Ark-la, Inc., ArHa Exploration Company, Pennzoil Producing Company, Total Mina-tome Corporation and Murphy Oil USA, Inc. are the successors of Union Producing Company’s rights. The Bureau leased rights in the property known as the “Miss Murphy USA Lease” to W.R. Stephens and Natural Gas and Oil Corporation. Arkla Exploration Co. and Murphy Oil USA, Inc., are the successors of the leasehold rights of W.R. Stephens and Natural Gas and Oil Corporation. These seven lessees are the plaintiffs in Suit Number 262,928.
The Bureau of Land Management leased the mineral rights in the property known as the “Parcel 1” and “Parcel 4” land to Shell Oil Company in 1961. Rosewood Resources, Inc., is the successor in interest of the leasehold rights of Shell Oil Company and is the plaintiff in Suit Number 323,597.
The State of Louisiana notified the Suit Number 262,928 plaintiffs that $38,535.37 was owed in accordance with L.S.A.-R.S. 47:631 as a tax on the severed oil and gas for the period beginning October 1982. That amount was paid under protest pursuant to L.S.A.-R.S. 47:1576, and Suit Number 262,928 was filed for the recovery *1340 of that amount and all amounts paid since, which is in excess of $1,858,000.00.
The State notified Rosewood Resources that oil and gas severance taxes in the amount of $128,772.65 for the period March, 1986 through June, 1987, were being |2assessed from Rosewood in connection with the Barksdale leases in accordance with L.S.A.-R.S. 47:631. Rosewood paid the assessment under protest on October 15, 1987. Suit Number 323,597 was then filed by Rosewood to recover those amounts plus the assessments paid from July, 1987 through the present, an amount in excess of $314,000.
Two federal court proceedings were instigated a week prior to the filing of the first state court action. The cases were dismissed based upon the Tax Injunction Act, 28 U.S.C. Sec. 1341 which denies Federal Court jurisdiction in a proceeding of this nature.
Appeals were taken to the Fifth Circuit in both cases and the dismissal was affirmed. The Court held in MRT Exploration v. McNamara, 731 F.2d. 260 (Ct.App. 5th Cir.1984), that the Louisiana Department of Revenue and Taxation is taxing only the revenues of the plaintiffs and not the royalty going to the United States and that there is no reason why Louisiana should be any less free from federal interference in the administration or [sic] its own fiscal affairs because these plaintiffs extracted mineral, which came beneath federal lands. The Fifth Circuit then directed the matter to state courts for a determination of the validity of the tax. MRT Exploration, 731 F.2d. at 264.
Plaintiffs filed this action to recover severance taxes paid under protest for a period beginning in October of 1982. Plaintiffs argued that the Louisiana Severance Tax Statutes were unconstitutional as applied to oil and gas production from the Barksdale Air Force Base, a federal enclave. In response, defendant, the Louisiana Department of Revenue and Taxation, filed a reconventional demand for severance taxes covering the period from December of 1979 through September of 1982.[3] The trial court dismissed plaintiffs’ claims, holding that the Louisiana Severance Tax Statutes were valid and enforceable. The trial court determined that the Louisiana Severance Tax was an “income tax” within the meaning of the Buck Act. The trial court further determined that the 1976 amendment to the 1947 Mineral Leasing Act for Acquired Lands governed the leases at issue.
In supplemental reasons for judgment, the trial court granted judgment in favor of defendant on its reconventional demand, finding that plaintiffs in Suit Number 262,928 were liable for severance taxes for the period of December, 1979 through September, 1992. The trial court stated as follows:
| .^Stipulation Number 32[4], submitted by defendant and the Suit Number 262,928 plaintiffs, provides that if the taxes are found by this Court to be owing for the period in dispute in the main demand, that the taxes owed for the period December, 1979 through September, 1982, the period addressed in the reconventional demand, are in the amount of $1,866,146.59 plus legal interest from judicial demand (12-29-82) until paid.
*1341 Plaintiffs appealed, and this court affirmed the trial court’s judgment. MRT Exploration Co. v. McNamara, 94 CA 0063 (La.App. 1st Cir. 12/29/94); 648 So.2d 1108, cert. denied, — U.S. -, 116 S.Ct. 192, 133 L.Ed.2d 128 (1995). Plaintiffs subsequently-filed a writ application with the Louisiana Supreme Court. The Louisiana Supreme Court granted the writ application in part, finding that the trial court and this court had misconstrued Stipulation No. 32. MRT Exploration Co. v. McNamara, 95-0565 (La. 5/19/95); 654 So.2d 1083. The matter was remanded to the court of appeal for a determination of whether the production of oil, gas and condensate between December, 1979 and September of 1982 was subject to taxation. Otherwise, the writ application was denied.

DISCUSSION

Plaintiffs contend that, during the period in question (December, 1979 through September, 1982), LSA-R.S. 52:1 specifically prohibited the levying of severance taxes. Plaintiffs allege that it was not until LSA-R.S. 52:1 was amended in 1982 that the prohibition against severance taxes was removed.
LSA-R.S. 52:1, in its pre-amendment form, provided as 14foIlows:
The United States, in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, may acquire and occupy any land in Louisiana required for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property. The property shall be exempt from all taxation, assessments, or charges levied under authority of the state.
The state may serve all civil and criminal process issuing under authority of Louisiana on the property acquired by the United States. (Emphasis ours).
It is apparent from an examination of this statute that it was the state’s intent to exempt land acquired by the United States from all taxation, including severance taxes. We are satisfied that Barksdale Air Force Base fell within the ambit of this statute and was exempt from taxation. See Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964).
This interpretation is bolstered by the fact that LSA-R.S. 52:1 was amended in 1982 to provide as follows:
A. The United States, in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, may acquire and occupy any land in Louisiana required for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property.
B. The property shall be exempt from all taxation, assessment, or charge levied under authority of the state. Nothing herein shall be construed or held to affect the rights of Louisiana or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon the severance of natural resources, or other rights, property, or assets of any lessee of the United States.
C. The state may serve all civil and criminal process issuing under authority of Louisiana on the property acquired by the United States.
The major difference between the original and amended version of LSA-R.S. 52:1 is the addition of the sentence in Section B which provides as follows:
Nothing herein shall be construed or held to affect the rights of Louisiana or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon the severance of natural resources, or other rights, property, or assets of any lessee of the United States.
It is a well established rule of statutory construction that | gthe Legislature is pre *1342 sumed to have enacted a statute in light of preceding statues involving the same subject matter, and decisions construing such statutes and, where the new statute is worded differently from the preceding statute, the Legislature is presumed to have intended to change the law. Doyal v. Roosevelt Hotel, 234 So.2d 510, 513 (La.App. 4th Cir.1970). We are satisfied that the Legislature, by its 1982 amendment to LSA-R.S. 52:1, intended to specifically authorize the imposition of severance taxes upon natural resources severed from within the confines of land acquired by the United States.
The Department argues that plaintiffs’ reliance on LSA-R.S. 52:1 is misplaced. The Department contends that, because the United States acquired the land now known as Barksdale through several acts of donation, LSA-R.S. 52:2 is applicable. The Department argues that LSA-R.S. 52:1 is a general statute, whereas LSA-R.S. 52:2 is a special statute applicable to the Barksdale Air Force base; therefore, LSA-R.S. 52:2 takes precedence over LSA-R.S. 52:1. The Department contends that LSA-R.S. 52:2 contains no waiver of the power to levy a severance tax on oil, gas and other minerals extracted from Barksdale by private lessees.
LSA-R.S. 52:2, entitled “Donations to the United States for certain purposes; officers making donations,” presently provides as follows:
The state or any state agency or subdivision may donate or convey to the United States any lands, movable or immovable property, rights of way, or servitudes which they may own or acquire, for use by the United States in connection with:
(1) The improvement and maintenance of the navigation of natural waterways;
(2) The construction, improvement, and maintenance of artificial navigable waterways, river and harbor works;
(3) Flood control works;
(4) Airports, flying fields, landing fields, parks, forest preserves, canals, irrigation districts, hospitals, agricultural experiment and research stations, military posts and for any military purposes.
In the ease of property owned by Louisiana or any state board, commission, department or agency, the transfer or conveyance shall be performed jointly by the governor and the register of the state land office, with the consent and approval of the lieutenant governor or the attorney | (¡general. The commission council or other governing body of a municipality shall transfer or convey property owned by a municipality. In the case of a parish, the parish governing authority shall transfer or convey the property, and in the case of any other subdivision of the state the governing body shall transfer property.
Plaintiffs argue that the Department’s contention that LSA-R.S. 52:2 is the controlling statute in this matter, rather than LSA-R.S. 52:1, falls when these provisions are compared to Article IV, § 12 of the Louisiana Constitution of 1921. This particular provision of the Constitution authorized the donation of property to the United States, and provided that such donations would be effected “through the authorized representatives” of the donee thereof. LSA-R.S. 52:2 has its origin in Act No. 75 of the Louisiana Legislative Session of 1940. Upon analysis, it becomes obvious that the purpose of this Act was to carry out the provisions of Article IV, § 12 of the Constitution of 1921. Section 1 of Act No. 75 of 1940 is a verbatim recitation of Article IV, § 12 of the Constitution of 1921, with Section 2 of the Act defining who the authorized representatives were to be in the event the State or any agency, branch, municipality or subdivision thereof donated or otherwise conveyed to the United States any lands, property, or movable and immovable. Thus, we find that the Department’s argument as to the applicability of LSA-R.S. 52:2 is without merit.
Because we find that the pre-amended version of LSA-R.S. 52:1 is dispositive of the issue to be addressed on remand, it is unnecessary to address the remaining arguments advanced by plaintiffs.

*1343
CONCLUSION

For the foregoing reasons, the judgment of the trial court on the reconventional demand is hereby reversed. The costs of this appeal assessed to plaintiffs, Arkla, Inc., Pennzoil Producing Company, Arida Exploration Company, Murphy Oil USA, Inc., and Total Minatome, in the original judgment (one-half) are to be reassessed and shared pro-rata with the Louisiana Department of Revenue and Taxation.
REVERSED.

. Suit Number 262,928 and Suit Number 323,-597 were consolidated by the trial court. We will refer to the appellants from both suits collectively as "plaintiffs." Plaintiffs in Suit Number 262,928 (our docket number 94 CA 0063) are Arida, Inc., Pennzoil Producing Company, Arkla Exploration Company, as successor to the interests of MRT Exploration Company and Mississippi River Corporation Transmission Corporation, Murphy Oil USA, Inc., and Total Minatome Corporation, as successor to the interests of Texas Gas Exploration Corporation by corporate merger. The plaintiff in Suit Number 323,597 (our docket number 94 CA 0064) is Rosewood Resources, Inc.

. The reconventional demand was filed in Suit Number 262,928 only.

. Stipulation Number 32 provided as follows:
Suit No. 262,928 Plaintiffs acknowledge that the value of the oil severed from the wells located on the Miss Murphy Lands and the Parcel 3 Lands during the months December 1979 through September 1982 was such that the Louisiana severance tax attributable thereto would have been $996,119.53 if such production is held to be subject to taxation, that the quantity of gas severed from the wells located on the Miss Murphy Lands and the Parcel 3 Lands during the months December 1979 through September 1982 was such that the Louisiana severance tax attributable thereto would have been $742,870.34 if such production is held to be subject to taxation, and that the value of the condensate severed from the wells located on the Miss Murphy Lands and the Parcel 3 Lands during the months December 1979 through September 1982 was such that the Louisiana severance tax attributable thereto would have been $127,156.72 if such production is held to be subject to taxation, all as is more particularly set forth on Exhibit "Q" attached hereto and made a part hereof.